UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>Ralph Holder</u>

     v.                       Civil No. 08-cv-197-JL
                                     Opinion No. 2010 DNH 019
<u>Town of Newton, et al.</u>

**OPINION & ORDER**

Challenging the constitutionality of a warrantless arrest followed by overnight detention, plaintiff Ralph Holder brought suit under 42 U.S.C. § 1983 asserting a multitude of constitutional and related state-law claims against the officers who arrested him, their respective towns and police chiefs, and the county jail and its superintendent.  He alleges that the officers entered his home without a warrant or exigent circumstances, arrested him without probable cause, and used excessive force to remove him.  He also alleges that the county jail, knowing he was eligible for release on bail, refused to arrange a bail hearing until the next morning.

The defendants have moved for summary judgment on all claims.  <u>See</u> Fed. R. Civ. P. 56.  This court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction).  After oral argument, summary judgment is granted.  The officers clearly had probable cause to arrest Holder and did not use excessive force.  Whether they

violated the Fourth Amendment by following Holder into his home to complete the arrest is debatable.  But our court of appeals has granted qualified immunity to the police in nearly identical circumstances, and this court does the same.  As for the overnight detention, the county jail promptly notified the bail commissioner of Holder's arrest and had no constitutional obligation to arrange a bail hearing before morning.

## I.  <u>**Applicable legal standard**</u>

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" if it could reasonably be resolved in either party's favor at trial, and "material" if it could sway the outcome under applicable law. <u>Mulvihill v. Top-Flite Golf Co.</u>, 335 F.3d 15, 19 (1st Cir. 2003). In making this determination, the "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor."  <u>Id.</u>  This indulgence, however, "does not relieve the nonmovant of the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe."  <u>Id.</u>  The

2

court "must ignore conclusory allegations, improbable inferences, and unsupported speculation" in determining whether summary judgment is appropriate.  Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009).

## II.  Background

This case arises from a domestic disturbance that Holder's 20-year-old daughter reported to the Newton, New Hampshire police department around 5 p.m. on May 17, 2005.  Officer Joseph Saluto immediately went to Holder's house and spoke with his daughter, who was the only person still there.  She told him that Holder had tried to kick her out of the house that afternoon.  In the process, she said, Holder had threatened and physically assaulted her, grabbing her arm and neck and pushing her against a wall.[1] Officer Saluto observed a red mark on her neck and found the house in disarray, consistent with a struggle.  He called for medical assistance.  Holder's daughter ultimately left the house with medical personnel, went to the hospital, and made plans to stay at a shelter that night.

---

[1] The parties dispute whether Holder actually committed these acts.  For purposes of analyzing the summary judgment motions, this court assumes that he did not.

Officer Saluto drove past Holder's house again around 8 p.m. and saw a truck in the driveway.  He contacted Officer Chad Larson from neighboring East Kingston, New Hampshire, and asked for his help in arresting Holder for assault under N.H. Rev. Stat. § 631:2-a.  After Officer Larson arrived, they walked together to the front door and knocked.  Holder opened the door, wearing only a tee shirt and boxer shorts.  The officers explained that they were arresting him for assaulting his daughter and asked him to step outside.  Holder refused to do so. For about thirty seconds, he tried to debate whether he should be arrested.  Then he went back into the house, telling the officers he needed to go to the living room to put pants on.  He left the door slightly open behind him.

The officers followed Holder through the open door to complete the arrest.[2]  Inside the house, Holder continued to debate with the officers and urged them to call their superiors, which they refused to do.  Holder then requested permission to call his ex-wife to come for their 9-year-old son, who was in the house preparing to take a shower.  The officers agreed to make the call themselves.  As they did, Holder went to speak with his

---

[2]The parties dispute whether Holder consented to the officers' entry.  For purposes of analyzing the summary judgment motions, this court assumes that he did not.

4

son in the bathroom.  After the call, Holder allowed the officers

to handcuff him.  Because he is a large man and claimed to have

shoulder problems, the officers triple-cuffed him (i.e., used

three pairs of handcuffs linked together in a chain) behind his

back to allow greater spread between his hands.

The officers then attempted to lead Holder out of the house.

Holder resisted, telling them to wait until his ex-wife arrived.

Twice he put his foot on the doorframe to prevent them from

taking him outside.  That caused the officers to tighten their

hold on his arms, which in turn caused Holder to acquiesce.  The

officers brought him outside and put him in the back of the

police cruiser.  Once there, he complained about shoulder pain

from his handcuffs, so the officers re-cuffed him with his hands

in front of his body.  Officer Larson then went back into the

house to help Holder's son gather his clothing and prepare for

his mother's arrival.

Holder's ex-wife arrived around 9:30 p.m. and took custody

of her son.  At that point, Officer Larson left the scene, and

Officer Saluto transported Holder to the Rockingham County

Department of Corrections ("DOC").  During the booking process,

Officer Saluto contacted a bail commissioner to determine

Holder's bail eligibility.  The commissioner advised Officer

Saluto to "offer"[3] Holder bail in the amount of $2500.  Before
leaving the DOC, Officer Saluto relayed that information to
Holder, who happened to have $2759 in his wallet when arrested.

After booking, which took until about 10:30 p.m., Holder
asked DOC staff when they were going to contact the bail
commissioner to arrange a bail hearing.  They told him that,
under DOC policy, he could not be released at night without a
ride home.  The DOC is in a rural area with dark roads and no
taxi service at night.  Holder, who lived at least five miles
away, did not have a ride.  The bail commissioner came to the DOC
in the morning and ordered Holder's release on bail at 6:44 a.m.
Holder was released shortly thereafter.  In the ensuing state
criminal proceedings, he was found guilty of resisting arrest,
but the judge did not impose any sentence.  The assault charges
were dismissed.

Holder then filed this § 1983 suit against three sets of
defendants:  Officer Saluto, the Town of Newton, and its police
chief (the "Newton defendants"); Officer Larson, the Town of East
Kingston, and its police chief (the "East Kingston defendants");

---

[3]What the commissioner meant by the term "offer" is unclear,
but not material to the outcome.  As discussed infra, Holder
conceded in his summary judgment affidavit that the county jail
had no authority to release him without a signed order from the
commissioner or a judge.  See N.H. Rev. Stat. § 597:2.

and the DOC and its superintendent (the "county defendants").[4]
His complaint asserted constitutional claims under the First
Amendment (retaliation), Fourth Amendment (unreasonable search
and seizure), Fifth Amendment (due process), Sixth Amendment
(notice of accusation), Eighth Amendment (excessive bail), and
Fourteenth Amendment (due process and equal protection).  In
addition, Holder asserted state-law claims for false arrest,
trespass, assault and battery, false imprisonment, malicious
prosecution, negligent hiring and retention, negligent training
and supervision, and negligent performance of duties.

Earlier in the case, the county defendants moved to dismiss
the § 1983 claim against them, arguing that Holder's overnight
detention was too short to be constitutionally significant.[5]
This court disagreed, noting that "[t]here is a substantial body
of law in support of the proposition that a plaintiff who alleges

---

[4]Officers Saluto and Larson were sued in their individual
capacities.  The other defendants were sued in their official
capacities.

[5]The county defendants also moved to dismiss Holder's § 1983
claim to the extent that it alleged a denial of adequate medical
care during his detention.  This court granted dismissal because
Holder had not sufficiently alleged that the county defendants
acted pursuant to a policy or custom, as required to establish
constitutional liability.  See Holder, 638 F. Supp. 2d at 157
(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694
(1978)).  At oral argument, Holder conceded that this court's
earlier ruling, together with his failure to disclose a medical
expert, forecloses any claim for medical damages.

overdetention, sometimes even for a very short period, states a claim for constitutional violations." Holder v. Town of Newton, 638 F. Supp. 2d 150, 153 (quoting Barnes v. District of Columbia, 242 F.R.D. 113, 117 (D.D.C. 2007)). Because "'overdetention' means . . . that the plaintiff has been imprisoned by the defendant for longer than legally authorized," this court made clear that such a claim could succeed only if "the bail commissioner effectively ordered [Holder's] release on his own recognizance but the county defendants nevertheless continued to hold him." Id. at 153, 155. The opinion deferred until a later stage the question of whether Holder was, in fact, "overdetained" in this sense or, if not, whether any role the county defendants played in delaying the bail order could itself be actionable. Id. at 155-56. That stage has now arrived, as all defendants have moved for summary judgment on all claims.[6]

---

[6]Holder argues that this court's earlier decision on the motion to dismiss precludes reconsideration of the same issues on summary judgment. Of course, this argument is clearly wrong, if not frivolous, and would be so even if the earlier decision had not expressly contemplated such future consideration. Holder also argues that he needs more time for discovery. But because he opposed summary judgment on the merits without seeking relief under Fed. R. Civ. P. 56(f), he has waived any such argument. See Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 282 n.7 (1st Cir. 2006). Moreover, with the case on the eve of trial and the discovery deadline past, Holder has not given this court any reason to believe that additional discovery would affect the analysis of the summary judgment motions.

## III.  **Analysis**

This court must determine whether Holder has any trialworthy claims against the defendants.  Although his complaint takes a scattershot approach and alleges many different constitutional violations, all of them arise from two key events:  (A) Holder's warrantless arrest in his home and (B) his overnight detention. After analyzing both events, this court will also address (C) Holder's related state-law claims.  As explained below, the only claim that may have some merit is Holder's Fourth Amendment challenge to the warrantless home entry, the legality of which is debatable.  But because the law is not clearly established on that point, the officers are entitled to qualified immunity. This court therefore grants summary judgment on all claims.

## A.  **The warrantless arrest**

Holder's warrantless arrest raises three constitutional questions:  (1) whether the officers had probable cause; (2) if so, whether exigent circumstances justified a warrantless entry into his home in order to complete the arrest; and (3) whether the officers used excessive force in carrying out the arrest. This court will address each question in turn.

1.  *Probable cause*

First, Holder argues that the officers violated the Fourth
Amendment by arresting him without probable cause.  <u>See</u> U.S.
Const. amend. IV (prohibiting "unreasonable searches and
seizures"); <u>Michigan v. Summers</u>, 452 U.S. 692, 700 (1981)
(stating "the general rule that every arrest . . . is
unreasonable unless it is supported by probable cause").
Probable cause exists when the "facts and circumstances within
the officer's knowledge" at the time of arrest "are sufficient to
warrant a prudent person, or one of reasonable caution, in
believing . . . that the suspect has committed, is committing, or
is about to commit an offense."  <u>Holder v. Town of Sandown</u>, 585
F.3d 500, 504 (1st Cir. 2009) (quoting <u>Michigan v. DeFillippo</u>,
443 U.S. 31, 37 (1979)).  "The test for probable cause does not
require the officers' conclusion to be ironclad, or even highly
probable.  Their conclusion that probable cause exists need only
be reasonable."  <u>Id.</u> (quoting <u>Acosta v. Ames Dep't Stores, Inc.</u>,
386 F.3d 5, 11 (1st Cir. 2004)).

Here, the officers arrested Holder based on his daughter's
allegation that he had physically assaulted her, grabbing her arm
and neck and pushing her against a wall.  Officer Saluto
discussed the incident with Holder's daughter shortly after it
happened, giving him a firsthand opportunity to assess her

10

credibility.  He also observed a red mark on her neck and found
Holder's home in disarray, which appeared to corroborate her
allegations.  She ultimately left with medical personnel and made
plans to stay at a shelter that night, a further indication that
her allegations were genuine.  The officers knew of no reason to
doubt her.  Under these circumstances, it was reasonable for them
to believe that Holder had, in fact, assaulted his daughter.
See, e.g., Bryant v. Noether, 163 F. Supp. 2d 98, 108 (D.N.H.
2001) (McAuliffe, C.J.) ("Although not a per se rule, a victim's
statement will generally suffice to support probable cause,
absent some reason to doubt the victim's reliability.") (citing
B.C.R. Transp. Co. v. Fontaine, 727 F.2d 7, 10 (1st Cir. 1984)).

Holder argues that if the officers had investigated his
daughter's allegations more thoroughly, they would have learned
that she has mental health and drug abuse problems and lacks
credibility.  But "[p]robable cause determinations are, virtually
by definition, preliminary and tentative."  Acosta, 386 F.3d at
11.  Our court of appeals has "disclaimed any unflagging duty on
the part of law enforcement officers to investigate fully before
making a probable cause determination," explaining that "an
officer normally may terminate her investigation when she
accumulates facts that demonstrate sufficient probable cause."
Id.  As explained above, the facts accumulated in this case

11

easily rose to that level.  The officers did not need to investigate any further before making an arrest.

Holder also argues that even if the officers had probable cause when they showed up at his door, they lost it during the ensuing "debate,"[7] in which Holder denied assaulting his daughter and explained his side of the story.  This argument has no merit. It would be nearly impossible for the police to carry out an arrest if the suspect's mere denials were enough to extinguish probable cause, especially in the face of otherwise credible victim testimony and corroborating evidence.  Holder has not identified any authority for that position.  Indeed, the authority is to the contrary.  See, e.g., Reynolds v. Jamison, 488 F.3d 756, 768 (7th Cir. 2007) (concluding that an officer "could not be expected to believe [the suspect's] declarations of innocence"); Cox v. Hainey, 391 F.3d 25, 32 n.2 (1st Cir. 2004) ("A reasonable police officer is not required to credit a suspect's story.").

---

[7]Given Holder's admission that he "debated" the assault charge at length with the officers, there is also no merit to his conclusory allegation that he was not "informed of the nature and cause of the accusation" against him as required by the Sixth Amendment.  U.S. Const. amend. VI.  Moreover, this claim is based on a misunderstanding of the Sixth Amendment, which does not demand such notice immediately upon arrest.  See, e.g., Solis v. Prince George's County, 153 F. Supp. 2d 793, 803 (D. Md. 2001) (citing case law).

As a final nail in the coffin, this court agrees with the defendants that Holder conceded the existence of probable cause at his deposition.  Here is the relevant question-and-answer:

> Q:   So they had probable cause to arrest, they just couldn't come into the house to do it?
>
> A:   Yes, sir.

Holder has tried to argue his way out of that concession, but it could not be any clearer.[8]  And it has the added benefit of being right.  The officers had probable cause to arrest Holder based on his daughter's allegations and corroborating evidence.  His claim therefore fails.

### 2.   *Exigent circumstances*

Next, Holder alleges that the officers violated the Fourth Amendment by entering his home without a warrant in order to carry out the arrest.  The Supreme Court, emphasizing that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," has held that warrantless "arrests in the home are prohibited by the Fourth

---

[8]This court devoted a substantial amount of time to the probable cause issue at oral argument, because Holder's counsel refused to acknowledge his client's concession.  It is counsel's obligation to know and fairly represent the record at oral argument, as well as to advise his client against taking unreasonable positions.  Neither appears to have happened here.

13

Amendment, absent probable cause and exigent circumstances."
Welsh v. Wisconsin, 466 U.S. 740, 748-49 (1984) (citing Payton v.
New York, 445 U.S. 573 (1980)).  As just explained, the officers
clearly had probable cause to arrest Holder.  The more difficult
question is whether exigent circumstances justified their entry
into his home.

"To show exigent circumstances, the police must reasonably
believe that there is such a compelling necessity for immediate
action as will not brook the delay of obtaining a warrant."
DeMayo v. Nugent, 517 F.3d 11, 15 (1st Cir. 2008).  Common
examples include "(1) 'hot pursuit' of a fleeing felon; (2)
threatened destruction of evidence . . . ; (3) a risk that the
suspect may escape from the residence undetected; or (4) a
threat, posed by a suspect, to the lives or safety of the public,
the police officers, or to herself."  United States v. Martins,
413 F.3d 139, 146-47 (1st Cir. 2005) (cautioning that this "list
is not an exclusive compendium").  The defendants have presented
two theories of exigency in this case.  While neither theory is
airtight, the court of appeals has relied on each of them in
granting qualified immunity under similar circumstances.  This
court does the same.

The first theory is that the officers, having announced the
arrest while Holder was standing in his open doorway, were

justified in entering his home to complete the arrest because it would have been dangerous to let him out of their sight at that point.  The defendants derive this theory from <u>United States v. Santana</u>, 427 U.S. 38 (1976), where the Supreme Court held that the police were justified in entering a house to arrest a felony suspect who had been standing in her doorway but then retreated inside when the police announced their presence.  The Court described the doorway as a "public place" and reasoned that "a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place."  <u>Id.</u> at 43.  The Court also noted that the police had a "realistic expectation that any delay would result in destruction of evidence."  <u>Id.</u>

This case is more difficult than <u>Santana</u> because Holder came to the doorway only after the officers knocked, his alleged offense was only a misdemeanor, and the officers have articulated no fear that he would destroy evidence.  But despite these differences, the court of appeals has granted qualified immunity to the police in a case involving nearly identical circumstances to these.  <u>See</u> <u>Joyce v. Town of Tewksbury</u>, 112 F.3d 19 (1st Cir. 1997) (en banc).  As in this case, the suspect in <u>Joyce</u> came to the door when officers knocked.  The officers announced, as they did here, that they were arresting him for misdemeanor relating

15

to a domestic disturbance and asked him to step outside.[9]  Like

Holder, the suspect refused to do so and retreated into the

house.  And as in this case, the officers followed him inside to

complete the announced arrest.  Id. at 20.

The court of appeals, sitting en banc, rejected the view

that Santana "turn[s] on whether the individual is standing

immediately outside or immediately inside the house when the

police first confront him and attempt an arrest."  Id. at 22.

Likewise, the court downplayed the felony/misdemeanor

distinction, noting that domestic abuse is "among the more grave

offenses affecting our society."  Id.  Nevertheless, the court

acknowledged that Santana did not "definitively resolve" the

constitutional issue and that "there are arguments to be made on

both sides," id., as evidenced by a strong dissent from Judges

Selya and Stahl arguing that the home entry violated the Fourth

Amendment.  See id. at 24.  "Given the unsettled state of the

law," the court of appeals had "no hesitation in concluding that

---

[9]Although the police in Joyce claimed to have a warrant for
the suspect's arrest, that fact was not relevant to the
constitutional analysis because the home belonged to the
suspect's parents, not the suspect himself.  To enter a third
party's home to effectuate an arrest, the police generally must
have a search warrant (not just an arrest warrant) or must be
faced with exigent circumstances.  See Joyce, 112 F.3d at 22
(citing Steagald v. United States, 451 U.S. 204, 212-13 (1981)).
So Joyce did not turn on the presence of a warrant, but rather
the presence of exigent circumstances.

the officers in this case [were] protected by qualified
immunity." Id. at 22.  The court declined to resolve the
underlying constitutional issue, explaining that it could "await
a case where the issue is decisive." Id. at 23.  That case has
not yet come.

The question, then, is whether Joyce's qualified immunity
analysis still holds true today.  This court concludes that it
does.  Qualified immunity is an affirmative defense that shields
government officials from having to litigate all the way to
trial, provided that they can meet their burden of showing that
they did not violate "clearly established" constitutional rights.
See, e.g., DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 35 (1st Cir.
2001).  In analyzing such a defense, the court must evaluate "(1)
whether the facts alleged or shown by the plaintiff make out a
violation of a constitutional right; and (2) if so, whether the
right was 'clearly established' at the time of the defendant's
alleged violation." Maldonado v. Fontanes, 568 F.3d 263, 269
(1st Cir. 2009) (quoting Pearson v. Callahan, 129 S. Ct. 808,
815-16 (2009)).  Here, even if Holder could show that the
warrantless entry violated his Fourth Amendment rights, that
conclusion was not "clearly established" at the time of his
arrest in 2005.  Indeed, our court of appeals reiterated in 2004
that "the law is not clearly defined" regarding doorway arrests.

United States v. Beaudoin, 362 F.3d 60, 68 n.4 (1st Cir. 2004),
vacated on other grounds, Champagne v. United States, 543 U.S.
1102 (2005).  And another district court noted in 2005 that the
issue "is in great dispute among the federal courts."  Breitbard
v. Mitchell, 390 F. Supp. 2d 237, 248 (E.D.N.Y. 2005).  Because
the law remains unsettled, qualified immunity applies.

If anything, this case is easier than Joyce.  There, the
court of appeals had "no information as to whether [the suspect's
underlying] conduct . . . involved actual violence," which made
the exigency argument even more tenuous.  112 F.3d at 22.  Here,
in contrast, Holder had been accused of actual violence against
his daughter.  Indeed, that is the basis for the defendants'
second theory of exigency:  that they acted pursuant to a New
Hampshire statute requiring the police to "use all means within
reason to prevent further [domestic] abuse"[10] and expressly
authorizing warrantless arrests within 12 hours of any such
offense, whether or not the officer witnessed it.  See N.H. Rev.
Stat. § 173-B:10 (incorporating by reference N.H. Rev. Stat. §
594:10).  The New Hampshire Supreme Court, in a case decided one

---

[10]The statute defines domestic abuse to include assault
against a family member "where such conduct constitutes a
credible threat to the [victim's] safety."  N.H. Rev. Stat. §
173-B:1.  As explained above, see supra Part III.A, the officers
had probable cause to believe that Holder had committed such an
offense.

year before Holder's arrest, expressly interpreted that statute as authorizing warrantless arrests in the home.  See New Hampshire v. Merriam, 150 N.H. 548, 551 (2004).

The defendants argue that the New Hampshire statute, as interpreted by Merriam, establishes a "per se exigency" for every warrantless arrest within 12 hours of domestic abuse.  But that probably goes too far, at least as a matter of Fourth Amendment law.  The Supreme Court has expressed "hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue," and has placed a "heavy burden" on the police to show that a true exigency exists.  Welsh, 466 U.S. at 750. Such determinations "must be made on a case-by-case basis." United States v. Wihbey, 75 F.3d 761, 766 (1st Cir. 1996).  Even for crimes as serious as murder, the Court has rejected a per se approach to exigency determinations under the Fourth Amendment. See Mincey v. Arizona, 437 U.S. 385 (1978) (involving a post-arrest search).  So it is highly unlikely that domestic abuse cases would receive per se treatment, even if that is what the New Hampshire statute contemplates.

This court need not decide whether the statute is constitutional as applied to Holder's arrest, however, because the officers clearly have qualified immunity here in light of the New Hampshire statute and case law.  Our court of appeals has

19

granted qualified immunity to the police in a similar § 1983 case involving the same statute.  See Malachowski v. City of Keene, 787 F.2d 704 (1st Cir. 1986).  There, the police entered the plaintiffs' house without a warrant to take their 16-year-old daughter into custody for juvenile delinquency.  The court of appeals analyzed the entry as follows:

> Even if we were to discern a constitutional infirmity in [the officer's] application of these state statutes to effect a warrantless home arrest, certainly [the officer] could not reasonably be expected to anticipate such a difficulty.  There can be no claim that these state statutory provisions obviously are illegitimate on their face.  [The officer] was entitled to act in accordance with governing state statutory law.  Since he conformed his conduct to that law, [the officer] is immune from damages liability under § 1983.

Id. at 714.

Although Malachowski is more than 20 years old, the New Hampshire Supreme Court's decision in Merriam gives it renewed vitality.  The officers here were entitled to act in accordance with their state statute as recently interpreted by their state's highest court.  And even if Malachowski's logic alone is not enough to shield the officers from liability, the combination of the defendants' two theories of exigency--one immunized in Joyce and the other in Malachowski--makes this a clear case for qualified immunity.

This is not to say, however, that the Fourth Amendment necessarily condones the officers' warrantless entry of Holder's home.  As both Joyce and Malachowski suggest, the constitutionality of such an entry is debatable, if not doubtful.  But the doctrine of qualified immunity "surround[s] the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases."  Roy v. Inhabitants of City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994).  This is a close enough case under existing precedent to warrant such protection.  And even if future cases establish that the officers made a mistake by entering Holder's home, "qualified immunity leaves 'ample room for mistaken judgments.'"  Berube v. Conley, 506 F.3d 79, 83 (1st Cir. 2007) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)); see also Fletcher v. Town of Clinton, 196 F.3d 41, 50 (1st Cir. 1999) ("Deference to those [on-the-spot] judgments may be particularly warranted in domestic disputes," where "violence may be lurking and explode with little warning.").

Holder argues that even if the officers have qualified immunity, their respective towns should be held liable for the warrantless home entry.  Because "municipalities do not enjoy qualified immunity," it is theoretically possible for them "to be held liable for the actions of lower-level officers who are

themselves entitled to qualified immunity." Joyce, 112 F.3d at
23 (citing Owen v. City of Independence, 445 U.S. 622, 650
(1980)).  But for that to happen, Holder would need to show that
a municipal "policy or custom" caused a violation of his
constitutional rights.  See Monell, 436 U.S. at 694; Est. of
Bennett v. Wainwright, 548 F.3d 155, 177 (1st Cir. 2008).  He has
not presented any evidence of an unconstitutional policy or
custom in this case.

The summary judgment record indicates that the relevant
municipal policy (adopted from the New Hampshire Attorney
General's model protocol for domestic abuse cases) expressly
advised officers not to enter a suspect's home to make an arrest
in the absence of exigent circumstances.[11]  Holder acknowledges
in his summary judgment affidavit that the policy, as well as the
officers' training, "re-enforced the constitutional requirements
for a warrant."  As to municipal custom, Holder has not
identified any other warrantless home arrests by Newton or East
Kingston police that lacked exigency.  "Evidence of a single
incident is usually insufficient to establish a custom." St.
Hilaire v. City of Laconia, 71 F.3d 20, 29 (1st Cir. 1995)

---

[11]This policy is not fatal to the officers' qualified
immunity defense because, as explained supra, whether exigent
circumstances existed here is debatable under existing case law.

(quotation omitted).  That is particularly apt where, as here, the municipality has a policy to the contrary.

In a last-ditch attempt to salvage this claim, Holder also argues that the officers violated the Fourth Amendment by re-entering his house immediately after the arrest to help his 9-year-old son.[12]  That argument was not properly raised in his complaint and, in any event, lacks merit for two reasons.  First, the re-entry was "no more than an actual continuation of the first" entry and thus does not require a separate analysis. Michigan v. Tyler, 436 U.S. 499, 511 (1978); see also Bilida v. McCleod, 211 F.3d 166, 172 (1st Cir. 2000).  Second, the re-entry was reasonable under the Fourth Amendment because, as Holder acknowledged at his deposition, his son was alone inside and in a "very precarious situation."  See, e.g., Martins, 413 F.3d at 148 (discussing case law allowing emergency entries to protect young children).

---

[12]Holder also alleges that, during his ensuing overnight detention, the police returned to his home yet again to search for incriminating evidence.  This claim, which relies solely on what Holder characterizes as the disarray he found in his home upon returning from jail, is wholly speculative and cannot survive summary judgment.  See Taylor, 576 F.3d at 24.

23

### 3.  *Excessive force*

Finally, Holder alleges that the officers used excessive force when removing him from the home.  "To establish a Fourth Amendment violation based on excessive force, a plaintiff must show that the defendant officer employed force that was unreasonable under the circumstances."  Jennings v. Jones, 499 F.3d 2, 11 (1st Cir. 2007).  This reasonableness determination is "objective" and requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest."  Id.

Holder, a large man, admits that he actively resisted arrest (and was found guilty of doing so).  Twice he put his feet on the doorframe to prevent the officers from taking him outside.  The officers responded by briefly tightening their hold on his arms until he acquiesced.  This limited use of force was both reasonable and necessary under the circumstances.  See, e.g., Jennings, 499 F.3d at 11 ("In making an arrest, a police officer has the right to use some degree of physical coercion or threat thereof to effect it . . . .  The use of force is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes.")

24

(quotation omitted); <u>Gaudreault v. Municipality of Salem, Mass.</u>, 923 F.2d 203, 205 (1st Cir. 1990) ("not every push or shove rises to the level of a constitutional violation").

Holder also argues that the officers exacerbated a pre-existing shoulder injury when they handcuffed him.  But he admitted at his deposition that the officers triple-cuffed him "to accommodate" his size and shoulder injury.  And when he complained about shoulder pain, they immediately re-cuffed his hands on the front of his body to make him more comfortable. Even assuming that Holder did experience some shoulder pain, "minor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force."  <u>Freeman v. Gore</u>, 483 F.3d 404, 417 (5th Cir. 2007); <u>see also</u> <u>Caron v. Hester</u>, 2001 DNH 206 (McAuliffe, D.J.) (rejecting a similar claim).

To summarize this court's analysis of the constitutional claims arising from Holder's arrest, the officers clearly had probable cause to arrest Holder for assault based on his daughter's allegations and corroborating evidence.  Whether they violated the Fourth Amendment by following Holder into his home to complete the arrest is debatable under existing precedent, but the very existence of that debate entitles them to qualified immunity.  Finally, the minimal force that the officers used to

25

subdue Holder was both reasonable and necessary under the circumstances, particularly in light of Holder's admitted resistance.  Summary judgment is therefore appropriate on all of Holder's arrest-related claims.

## B.  The overnight detention

The other half of this case relates to Holder's overnight detention in the county jail.  Holder initially alleged that the bail commissioner had ordered his release on the night of his arrest, but that the county jail nevertheless continued to detain him until the next morning.  This court ruled in an earlier opinion that if Holder could prove this allegation, then he might be able to show a due process violation under the Fourteenth Amendment.  Holder, 638 F. Supp. 2d at 155-57; see also U.S. Const. amend. XIV ("nor shall any State deprive any person of life, liberty, or property, without due process of law").  But this court cautioned that it "would seem to present a different question" if the county jail merely "learned, through contact with the bail commissioner on the night of Holder's arrest, that he would be eligible for release on his own recognizance, but that . . . the bail commissioner did not in fact order Holder's release until the next morning."  Id. at 155.  As it turns out, that is exactly what happened.  This court must therefore decide

that question:  whether due process required the county jail to arrange a nighttime bail hearing upon learning of Holder's eligibility for release.

There is no absolute right to bail under the Constitution. See United States v. Salerno, 481 U.S. 739, 752-53 (1987); United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.).  The Eighth Amendment prohibits "excessive bail,"[13] U.S. Const. amend. VIII, but the Constitution "says nothing about whether bail shall be available at all," Salerno, 481 U.S. at 752, or about the timing of bail determinations.  Nevertheless, because the bail process implicates a "vital liberty interest" under the Fourteenth Amendment, the Supreme Court has said that it must comport with due process requirements.  United States v. Montalvo-Murillo, 495 U.S. 711, 716 (1990) (citing Salerno, 481 U.S. at 739).  And while not necessarily suggesting that due process requires it, both the Supreme Court and our court of appeals have said that the bail determination needs to be made promptly.  See id. ("A prompt hearing is necessary . . . .");

---

[13]Aside from a conclusory allegation of excessive bail, Holder has not articulated why his bail (which he posted immediately after his bail hearing) was excessive.  Conclusory allegations cannot withstand summary judgment.  See Taylor, 576 F.3d at 24.

Acevedo-Ramos, 755 F.2d at 206 (acknowledging "the need to make the bail decision quickly").

In establishing a presumptive 48-hour requirement for probable cause hearings under the Fourth Amendment, the Supreme Court emphasized that it wanted to give states enough time to combine those hearings with other early-stage procedures, including specifically the bail determination. County of Riverside v. McLaughlin, 500 U.S. 44, 54 (1991). The clear import of McLaughlin, then, is that a bail hearing held within 48 hours of a warrantless arrest is also presumptively constitutional––if indeed the Constitution speaks to that issue. See, e.g., Collins v. Ainsworth, 382 F.3d 529, 545 (5th Cir. 2004) (rejecting due process challenge to state's 48-hour window for bail hearings and confirming that "[t]here is no right to post bail within 24 hours of arrest"). In this case, approximately nine hours passed between Holder's arrest and subsequent release. That is well within the 48-hour window and thus presumptively constitutional.

The Supreme Court has said that the presumption of constitutionality can be overcome--at least for probable cause hearings[14]--if the hearing is "delayed unreasonably."

---

[14]This court assumes, without deciding, that the same analysis applies to bail hearings (which is the best-case

28

<u>McLaughlin</u>, 500 U.S. at 56.  "In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility" and "cannot ignore the often unavoidable delays in . . . handling late-night bookings where no magistrate is readily available."  <u>Id.</u> at 56-57; <u>see also</u> 4 Wayne R. LaFave et al., <u>Criminal Procedure</u> § 12.1(b), at 8 (3d ed. 2007) (noting that the bail hearing is "often the following morning").  Here, Holder finished the booking process around 10:30 p.m., after normal court hours, and the bail commissioner ordered his release at 6:44 a.m., before normal court hours.  As <u>McLaughlin</u> implies, that sort of overnight wait is neither unusual nor unreasonable following an evening arrest.  <u>See</u>, <u>e.g.</u>, <u>O'Neal v. Cook</u>, No. 07-2803, 2009 WL 762207, at *4 (D. Minn. Mar. 19, 2009) (upholding overnight delay against constitutional challenge); <u>Parsons v. City of Rio Vista</u>, No. 398-cv-0920-G, 2002 WL 83769, at *2 (N.D. Tex. Jan. 14, 2002) (same).

Holder argues that the defendants should have arranged an immediate bail hearing because they knew, by virtue of a

_____

scenario for Holder).  That assumption may not be warranted, however, because probable cause is absolutely required for an arrest under the Fourth Amendment, <u>see</u> <u>Summers</u>, 452 U.S. at 700, whereas bail is not an absolute requirement, <u>see</u> <u>Salerno</u>, 481 U.S. at 752-53.  It is possible, if not likely, that the constitutional analysis is even more flexible with respect to the timing of bail hearings.

29

telephone call with the bail commissioner, that he was eligible

for release upon posting $2500 bail.  But if that were an

exception, it would swallow the rule.[15]  Almost every non-capital

offense is bail-eligible.  See, e.g., Petition of Streeter, 112

N.H. 305, 306 (1972) ("In this State bail before conviction is a

right that is protected and guaranteed by statute in noncapital

cases") (citing N.H. Rev. Stat. § 597:1); Stack v. Boyle, 342

U.S. 1, 4 (1951) ("From the passage of the Judiciary Act of 1789

to the present . . . federal law has unequivocally provided that

a person arrested for a non-capital offense shall be admitted to

bail.").  The fact that the bail commissioner confirmed as much

is unremarkable and is not enough to create a constitutional

right to immediate bail where none otherwise existed.  Cf. James

v. Griechen, No. 98-2245, 1999 WL 641867 (10th Cir. Aug. 24,

1999) (unpublished) (rejecting § 1983 claim that the officer

"knew that the magistrate planned to release [the suspect] on his

own recognizance and should therefore have released [him]"

immediately where the magistrate was unavailable).

   Holder attempts to analogize this case to Wagenmann v.

Adams, 829 F.2d 196 (1st Cir. 1987), where the court of appeals

held that a police officer who "help[ed] to shape, and

---

[15]It would also have the undesirable effect of discouraging
early discussions with the bail commissioner.

exercis[ed] significant influence over, the bail decision" could be held liable for the imposition of excessive bail even if not statutorily authorized to set bail himself.  Id. at 212.  But Wagenmann was a case of action that resulted in a clear violation of the Eighth Amendment right against excessive bail; this is a case of inaction that resulted in an overnight delay that was presumptively constitutional.  Moreover, Holder has not contested the county jail's assertion that it had no control over the bail commissioner and could not release him until she arrived.  See N.H. Rev. Stat. § 597:2 (requiring an appearance before a judge or bail commissioner before bail can be granted).  If anything, he seems to be complaining that the defendants did not exercise enough influence over the bail decision by urging the bail commissioner to hold a hearing in the middle of the night. Wagenmann presented the converse situation, where the officer had unduly influenced the bail process.  See id. (faulting the officer in that case because he "did not merely arrest [the suspect] and then step aside, letting an independent judicial officer set bail").

More illuminating here is Brady v. Dill, 187 F.3d 104 (1st Cir. 1999), where police officers "came to believe, with some degree of subjective certainty, that the man they had arrested

. . . was innocent," id. at 113, but nevertheless detained him for 36 hours pending an initial hearing before the magistrate judge.[16]  The court of appeals found no constitutional violation, explaining that in "post-arrest cases, it is ordinarily sufficient for the police officer to bring the relevant information to the attention of the prosecutor or the proper judicial official in a timeous fashion." Id. at 115 (relying on Baker v. McCollan, 443 U.S. 137 (1979)). Brady reflects the fundamental "notion that our constitutional system places responsibility for releasing a detainee on the judicial system, rather than on law enforcement officers who have accomplished the detention." Holder, 638 F. Supp. 2d at 155.

    In this case, Holder concedes that the defendants informed the bail commissioner of his arrest shortly after he arrived for booking and that the bail commissioner knew he would be detained overnight pending her arrival.[17]  Brady suggests that, at that

---

[16]The police attempted in Brady to arrange an expedited bail hearing before a bail commissioner, but the suspect insisted on seeing a judge.  That distinguishes Brady from this case as a factual matter (as do a number of other facts cutting the other way, such as the belief in the suspect's innocence and the much longer detention period), but its analytical framework is nonetheless helpful in resolving the issue here.

    [17]The bail commissioner is not a party to this case and, in any event, would have quasi-judicial immunity from civil liability for actions taken in that capacity.  See, e.g., Briand v. Morin, 2003 DNH 028 (DiClerico, D.J.).

point, the defendants had fulfilled their basic obligation, i.e., "bring[ing] the relevant information to the attention of . . . the proper judicial official in a timeous fashion."  If that is all the Constitution ordinarily requires when the police believe they have an <u>innocent</u> man in custody for 36 hours, then it is hard to imagine that it requires anything more when the police believe they have the right suspect and detain him for a much shorter period of time.

Holder has not identified any authority that interprets the Fourteenth Amendment to require that law enforcement officers arrange a nighttime bail hearing after a valid evening arrest. Given how common it is for such hearings to be held the next morning, <u>see</u> 4 LaFave, <u>supra</u>, § 12.1(b), at 8, the absence of such authority is strong evidence that no such requirement exists.  Moreover, the Supreme Court has made clear that law enforcement officers should be accorded a "substantial degree of flexibility" in scheduling early-stage criminal procedures. <u>McLaughlin</u>, 500 U.S. at 57.  Because Holder's bail hearing was conducted in a reasonably prompt manner, this court grants summary judgment to the defendants on Holder's challenge to the length of his detention.[18]

---

[18]Because the defendants had no obligation to arrange an expedited bail hearing on the night of Holder's arrest, this

In addition to challenging the length of his detention, Holder claims that the defendants had sinister motives for detaining him.  He alleges, in particular, that they discriminated against him because he is African-American (in violation of the Fifth and Fourteenth Amendments), retaliated against him because he complained about his treatment (in violation of the First Amendment), and "conspired together to enter into a nefarious scheme" to detain him overnight so that they could return to his house to search for incriminating evidence (in violation of the Fourth Amendment).  But none of these allegations has even the faintest support in the summary judgment record.  To the contrary, the record indicates that the defendants detained Holder pursuant to general laws and policies that applied equally to all detainees.  Because Holder's claims of improper motive rely on "improbable inferences" and "unsupported speculation," they cannot withstand summary judgment.  Taylor, 576 F.3d at 24.

In sum, the county jail promptly notified the bail commissioner of Holder's arrest and had no constitutional obligation to arrange a bail hearing before morning.  Holder

---

court need not analyze their alternative rationale for detaining him overnight, which is that he did not have a ride home as required by the county jail's nighttime release policy.

34

offers no evidence to support his allegations of racism, retaliation, or conspiracy.  Summary judgment is therefore appropriate on all of his detention-related claims.

## C.  State-law torts

Holder also brought an array of tort claims under New Hampshire state law.[19]  All of them relate to the same topics discussed above and fail for more or less the same reasons:

- Because the officers had probable cause to arrest Holder for assault, see supra Part III.A.1, and because New Hampshire law expressly authorized a warrantless arrest in his home, see supra Part III.A.2, Holder cannot recover for false arrest, trespass, or malicious prosecution.[20]  See, e.g.,

_____

[19]In most cases, the dismissal of all federal claims before trial "will point toward declining to exercise [supplemental] jurisdiction over the remaining state-law claims."  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).  But there is no "mandatory rule" requiring dismissal; courts must "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction."  Id.  In this case, the close proximity to trial and the heavy overlap between Holder's federal and state-law claims both point in favor of exercising jurisdiction.  See, e.g., Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1192 (2d Cir. 1996).  This court therefore resolves Holder's state-law claims as well.

[20]The question of the legitimacy of the warrantless arrest statute as a matter of federal law has no bearing on the officers' liability under New Hampshire law because, even if they committed any of these torts, they have official immunity from liability under state law.  Their decisions were discretionary,

<u>Forgie-Buccioni v. Hannaford Bros., Inc.</u>, 413 F.3d 175, 179-82 (1st Cir. 2005); <u>Kay v. Bruno</u>, 605 F. Supp. 767 (D.N.H. 1985).

- Because the officers used reasonable force to effectuate the lawful arrest, <u>see</u> <u>supra</u> Part III.A.3, Holder cannot recover for assault and battery.  <u>See</u>, <u>e.g.</u>, <u>Statchen v. Palmer</u>, 2009 DNH 137, 13 (DiClerico, D.J.).

- Because his detention was lawful and the county jail had no obligation to arrange a nighttime bail hearing under the Constitution, <u>see</u> <u>supra</u> Part III.B, or under New Hampshire law, <u>see</u> N.H. Rev. Stat. §§ 594:20-a and 597:1 <u>et</u> <u>seq.</u>, Holder cannot recover for false imprisonment.  <u>See</u>, <u>e.g.</u>, <u>Forgie-Buccioni</u>, 413 F.3d at 181; <u>MacKenzie v. Linehan</u>, 158 N.H. 476, 482 (2009).

- Because the defendants have presented uncontested evidence of adequate hiring, retention, training, and supervision, Holder cannot recover for any of those claims (which he conceded during an in-chambers conference before oral argument).

---

made within the scope of their official duties, and neither wanton nor reckless under the circumstances, particularly in light of the statute.  <u>See</u> <u>Everitt v. Gen. Elec. Co.</u>, 156 N.H. 202, 219 (2007) (identifying those as the three requirements for official immunity).

• And because his negligent performance claim is essentially just an amalgamation of these other claims, it too lacks merit.  See, e.g., Bryant, 163 F. Supp. 2d at 110.

IV.  **Conclusion**

For the reasons stated above, the defendants' motions for summary judgment[21] are GRANTED.  The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:     February 3, 2010

cc:        Sven D. Wiberg, Esq.
           Brian J.S. Cullen, Esq.
           Charles P. Bauer, Esq.
           Jeanne P. Herrick, Esq.
           Corey M. Belobrow, Esq.

---

[21]Documents no. 37, 38, and 40.

37